UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

CALAMAR ENTERPRISES, INC.,

                           Plaintiff,                Case No.: 1:16-cv-00686-EAW-HKS

vs.

BLUE FOREST LAND GROUP, LLC,

                           Defendant.

---

## **PLAINTIFF'S SECOND AMENDED COMPLAINT**

Plaintiff, Calamar Enterprises, Inc., by counsel, for its Second Amended Complaint against Defendant, Blue Forest Land Group, LLC, states:

### **INTRODUCTION**

1.      This dispute arises out of a series of transactions between Calamar Enterprises, Inc. ("Calamar"), a commercial real estate developer engaged in developing market rate independent living facilities for seniors (55 years of age and older), and Defendant Blue Forest Land Group, LLC ("Defendant"), a real estate development consultant, pertaining to services provided by Defendant to Calamar.

2.      Calamar seeks declaratory judgment on the first cause of action declaring that Defendant has no claim for payment of any alleged funds due and owing; declaratory judgment on the second cause of action that Defendant acted as a real estate broker without having required real estate licenses precluding it from being paid for its services and requiring it to disgorge all funds paid to it by Calamar; and for damages on its third cause of action for Defendant's breach of the Consulting Services Agreements.

3. Beginning in 2012 and continuing thereafter, Calamar retained Defendant to find and recommend to Calamar suitable sites for development within understood guidelines pertaining to location, parcel size, land cost, adequate rental charges, and other specified financial viability requirements

4. Defendant is not entitled to any payments from Calamar for the services provided by Defendant to Calamar, for the reasons set forth in this Complaint.

## THE PARTIES

5. Calamar's principal place of business is located at 3949 Forest Parkway, Suite 100, Wheatfield, New York 14120.

6. Upon information and belief, Blue Forest Land Group, LLC is a Kansas limited liability company and a provider of real estate consulting services located at 5861 South National Drive, Parkville, Missouri 64152.

## JURISDICTION AND VENUE

7. The Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a).

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## FACTS

9. Calamar is engaged in the business of commercial real estate development in New York State, as well as several other states, and in Ontario, Canada.

10. Among other property development project types, Calamar specializes in the development, construction and management of senior housing projects.

**Calamar Expands Its Senior Housing Portfolio**

11.     Calamar opened a satellite office in Omaha, Nebraska in 2011 in connection with its decision to explore the feasibility of developing senior housing facilities in the Mid-West Region of the United States, including in the states of Kansas, Missouri, Iowa and Nebraska.

12.     From the outset, Calamar followed a disciplined approach with respect to the expansion of its senior housing facility development program in the Mid-West Region by creating a set of criteria, with the assistance of its real estate market consultant GAR Associates, Inc. ("GAR"), that a proposed project must meet in order to ensure the financial success of that senior housing facility development project (the "Viability Parameters").

13.     These Viability Parameters included, without limitation, an assessment of the market demand for senior housing facilities in the vicinity of a proposed development site, a proposed site's suitability for development into a senior housing facility based on existing zoning designation and community acceptance, the ability to develop a senior housing facility at a specific site within a budget of cost and expense that would make the completed project financially viable, and the absence of adverse conditions that would create a risk of cost overruns.

14.     These Viability Parameters were known to Defendant, and Defendant's obligations were, among others, to locate sites and perform preliminary due diligence with respect to prospective sites to ensure that they met these Viability Parameters before recommending any site to Calamar for its consideration.

**Calamar Engages Defendant**

15. Around the time of Calamar's ramp up of Mid-West projects, Timothy Locher, Defendant's owner and President, traveled to Calamar's offices located in Wheatfield, New York to discuss and negotiate the terms of Defendant's engagement as a consultant.

16. During this meeting, Calamar and Defendant extensively discussed Calamar's goals, development models and Viability Parameters and negotiated the terms of Mr. Locher and/or Defendant's engagement as a consultant for Calamar to assist with locating and securing the purchase of prospective development sites.

17. Defendant represented to Calamar that Defendant had substantial knowledge, experience and capabilities in commercial real estate planning, construction and development, and Defendant held itself out as having the ability to locate, identify, and negotiate the purchase of potential sites for Calamar's senior housing facility projects that would meet the Viability Parameters.

18. Starting in 2012, in accordance with the aforesaid discussions and negotiations, Calamar hired Timothy Locher on a case-by-case basis to identify potential sites for Calamar's senior housing facility projects which met the Viability Parameters and to negotiate purchases of such sites on Calamar's behalf.

19. Calamar entered into two engagements with Timothy Locher in his individual capacity involving sites located in Kansas City, Missouri and in Independence, Missouri.

20. After these two engagements, Mr. Locher began transacting business with Calamar through Defendant. Despite this change, the role played by Defendant, and the terms of engagements, remained the same or substantially similar as the arrangement between Calamar and Mr. Locher.

21. Between 2014 and the present, Calamar and Defendant entered into fourteen Consulting Services Agreements (a true and correct copy of each respective contract is attached herewith and made a part hereof at the exhibits noted below):

- Indianola, Iowa – March 2014 (**Exhibit A**)
- Ankeny, Iowa – June 1, 2014 (**Exhibit B**)
- Johnson City, Kansas – July 1, 2014 (**Exhibit C**)
- West Des Moines, Iowa – July 15, 2014 (**Exhibit D**)
- Olathe, Kansas – December 10, 2014 (**Exhibit E**)
- Blue Springs, Missouri – February 1, 2015 (**Exhibit F**)
- Waukee, Iowa – February 1, 2015 (**Exhibit G**)
- Kansas City, Kansas – June 15, 2015 (**Exhibit H**)
- Lee's Summit, Missouri – September 17, 2015 (**Exhibit I**)
- Altoona, Iowa – December 3, 2015 (**Exhibit J**)
- Wichita, Kansas – December 3, 2015 (**Exhibit K**)
- Andover, Kansas – February 4, 2016 (**Exhibit L**)
- Shawnee, Kansas – April 5, 2016 (**Exhibit M**)
- South Kansas City, Missouri – March 9, 2016 (**Exhibit N**)

22. Each Consulting Services Agreement was a standard form of contract that was not a complete and integrated agreement and was heavily supplemented by the parties' course of dealing and course of performance.

23. Each Consulting Services Agreement is governed by New York law and was drafted by Defendant (or counsel for Defendant) and electronically sent to Calamar to be executed at its offices in Wheatfield, New York.

24. Over the course of these sixteen engagements over a period of three years, Defendant continuously communicated via telephone and email with various members of Calamar's staff, executive team and vendors (including GAR) on a near daily basis.

### The Parties' Course of Dealing and Course of Performance

25. Jocelyn Bos, Calamar's Director of Senior Housing, handled the day-to-day interactions with Defendant and interfaced with Defendant on Calamar's behalf prior to issuance of a Notice to Proceed (explained below).

26. In the performance of each Consulting Services Agreement, the practice and custom between the parties began with general geographic regions of interest being identified using a HISTA 2.2 Summary Report provided by GAR.

27. As the accepted practice between the parties, once a geographic zone of interest was identified with the HISTA Summary 2.2 Report, Defendant would start searching for potential senior housing facility sites in that geographic zone.

28. Defendant did this by first examining commercial real estate listings in the geographic zone of interest.

29. Defendant then coordinated and conferred with GAR and/or Calamar with regard to all Viability Parameters that needed to be met for each potential project site.

30. Defendant was responsible for the due diligence to ensure compatibility of any site recommended by Defendant for development with the Viability Parameters.

31. Defendant was required to recommend only sites that met all the Viability Parameters, and not otherwise.

32. Calamar relied on Defendant to investigate all factors pertaining to a potential site for compliance with the Viability Parameters before making its recommendation of any site for development by Calamar.

33. Defendant, consistent with instructions from Calamar and the contractual duties in the Consulting Services Agreements, would only submit to Calamar lists of properties in a particular geographic zone that were listed for sale and that met the Viability Parameters.

34. Calamar would then determine whether to issue Notices to Proceed directing Defendant to perform additional work, with the view of thereafter negotiating a purchase agreement to acquire these properties for development. The negotiations of the purchase contracts and sales were handled by Defendant on Calamar's behalf.

35. When recommending that Calamar pursue the acquisition of these various sites, Defendant necessarily represented that all of the requisite due diligence which Defendant agreed to perform in advance of making its recommendations had been performed.

36. Each Notice to Proceed entitled Defendant to an initial payment of $24,500.00, intended as a success fee for having located and identified a site for sale that conformed to the Viability Parameters. Defendant would be entitled to an additional $28,500.00 upon Calamar's execution of a purchase agreement for the site, intended as compensation for having negotiated and secured the purchase contract on Calamar's behalf.

37. This approach worked successfully on the initial projects pertaining to sites in Independence, Missouri; Kansas City, Missouri; Olathe, Kansas; Indianola, Iowa; and Ankeny, Iowa. However, after these initial projects, the performance by Defendant deteriorated as Defendant failed to ensure that the sites being recommended to Calamar met the Viability Parameters.

## Issues Pertaining to Topography:
### Altoona, Iowa Site

38. The Viability Parameters required a near flat topography at each site so that Calamar would not have to incur the expense of excessive cuts, fills and other site remediation work.

39. Defendant recommended the Altoona, Iowa site to Calamar for development and represented to Calamar that all Viability Parameters were met with respect to that site.

40. Calamar, relying on Defendant's recommendation, issued a Notice to Proceed to the Defendant with respect to the Altoona, Iowa site.

41. In fact, the topography of the property was not near level and development of the site into a senior housing facility would have required extensive site work.

42. Defendant performed its obligations negligently with respect to the Altoona, Iowa site. It should have known from an inspection of the site that the Altoona, Iowa property did not comply with Viability Parameters and required an excessive amount of fill and cuts to grade the land, resulting in additional costs in excess of $1,000,000.00 and rendering the site unsuitable for development. These additional costs would have required Calamar to increase rents to a level greater than the amount which demographic information about the site indicated was achievable.

43. Calamar ultimately entered into a purchase agreement for the Altoona, Iowa site and then was required to terminate the purchase agreement after learning that the costs of site remediation were not consistent with Calamar's Viability Parameters.

44. Negotiations of the purchase of the Altoona, Iowa site were handled by Defendant on Calamar's behalf.

**Issues Regarding Market Feasibility:
Western Wichita, Kansas; Andover, Kansas; Shawnee, Kansas and
<u>Lee's Summit, Missouri Sites</u>**

45. The Viability Parameters require that certain market demographic metrics be met by a site before it was to be recommended for development by Calamar.

46. In defining geographic zones of interest, Calamar obtained a HISTA 2.2 Summary Report as a tool to broadly assess demographic fit.

47. HISTA 2.2 Summary Reports are little more than a download of general demographic statistical information produced by Nielsen market research. They are <u>not</u> reports produced for Calamar's specific needs, and they do <u>not</u> contain site-specific data about the demographics surrounding the project sites in question, much less information about a potential site's capture rate or market penetration rate.

48. Two indispensable components of a market feasibility analysis are: (1) capture rate; and (2) penetration rate.

49. The capture rate is the percentage of age and income qualified renter households in the immediate geographic area that the property must capture to achieve a stabilized level of occupancy. The capture rate is an indication of the size of the market opportunity.

50. The penetration rate is the percentage of age and income qualified renter households in the immediate geographic area, and the number of existing and proposed properties competitively priced to attract those age and income qualified renter households. The penetration rate is an indication of the level of competition in a market.

51. Importantly, the ability to demonstrate an attractive capture rate and penetration rate is important to convince lenders and real estate investors to invest in a development project.

52. With respect to the sites in Western Wichita, Kansas; Andover, Kansas; Shawnee, Kansas; and Lee's Summit, Missouri, Defendant advised Calamar that the properties were suitable for development because they met the market demographic metrics and other Viability Parameters. As a result, Calamar issued Notices to Proceed to Defendant with respect to all of these sites.

53. Calamar entered into purchase contracts to acquire the Western Wichita, Kansas and Shawnee, Kansas sites and a letter of intent to further investigate purchase of the Lee's Summit, Missouri site in reliance upon Defendant's representations that the Viability Parameters had been properly vetted with respect to those sites.

54. The terms of the purchase contracts and letter of intent for the Western Wichita, Kansas; Shawnee, Kansas; and Lee's Summit, Missouri sites, respectively, were negotiated by Defendant on Calamar's behalf.

55. In fact, Defendant never determined the demographic metrics for any of these sites. Defendant has conceded that it relied solely on the HISTA 2.2 Summary Reports for the demographic due diligence, which is entirely insufficient to establish the required capture rate and penetration rate and thereby establish the financial viability of these sites for development by Calamar.

56. Calamar was required to terminate the purchase agreements for the Western Wichita, Kansas and Kansas City, Kansas sites after learning that the market demographics were inconsistent with Calamar's Viability Parameters.

57. Similarly, Calamar abandoned further due diligence on the Lee's Summit, Missouri site due to the market demographics which failed to conform to Calamar's Viability Parameters.

## Issues Regarding Purchase Price:
## Waukee, Iowa Site

58. The Viability Parameters for a potential project include a maximum land purchase price.

59. Under the Consulting Services Agreement for Waukee, Iowa, Defendant handled negotiations of purchase with the site owner on Calamar's behalf and represented to Calamar that the owner of the site had agreed to a specific purchase price within the maximum amount established by the Viability Parameters.

60. In reliance upon the Defendant's representation regarding the owner's agreement to the purchase price, Calamar issued a Notice to Proceed to the Defendant with respect to the Waukee, Iowa site and ultimately entered into a letter of intent to further investigate purchase of the site

61. The letter of intent for the Waukee, Iowa site was negotiated by Defendant on Calamar's behalf.

62. After issuance of this Notice to Proceed, Calamar learned that the owner of the Waukee, Iowa site <u>never</u> agreed to the purchase price as represented by Defendant.

63. The negotiations to acquire this site never advanced, as the parties were never able to reach agreement on the purchase price, leading Calamar to abandon further due diligence on purchase of the Waukee, Iowa site

## Zoning Issues:
## Andover, Kansas Site

64. The Viability Parameters include a requirement that a potential site be zoned to allow multi-family residential uses.

65. Calamar's arrangement with Defendant did not require Calamar to conduct its own independent diligence with respect to site zoning.

66. With regard to the Andover, Kansas site, the zoning of the site did not permit the development of a senior housing facility like the one planned by Calamar. Rather, local government consent to the modification of an existing Planned Unit Development (PUD) zoning designation was required before the Andover, Kansas could be eligible for development into a senior housing facility.

67. Defendant should have known that the site was not properly zoned for a commercial senior housing development before recommending the site to Calamar as conforming to the Viability Parameters.

68. In reliance upon Defendant's representations that all of the Viability Parameters were met by the Andover, Kansas site, Calamar issued a Notice to Proceed to Defendant with respect to this site and Calamar ultimately entered into a letter of intent to further investigate purchase of the site

69. The letter of intent for the Andover, Kansas site was negotiated by Defendant on Calamar's behalf.

70. Subsequently, Calamar learned that the Andover, Kansas site was not properly zoned and, accordingly, was not in conformity with Calamar's Viability Parameters.

**Issues Regarding Access and Utilities:
<u>Blue Springs, Missouri Site</u>**

71. The Viability Parameters require that a site have existing access to roads and utility hookups.

72. Defendant recommended the Blue Springs, Missouri site to Calamar as having met all Viability Parameters. In response, Calamar issued a Notice to Proceed with respect to this site.

73. Subsequently, Calamar learned that the Blue Springs, Missouri site required a roadway extension to provide the site with suitable access, a fact that would be patently obvious to Defendant.

74. Additionally, the site had no existing utility hookups and, therefore, Calamar would have to incur unanticipated costs in bringing utility services to the site before development of the site could proceed.

75. Defendant knew or should have known from visiting the site that there was no existing road access and that no utility hookups were available at this site.

76. Defendant also knew that this site was located in close proximity to Calamar's senior housing community in Independence, Missouri, which would result in competition between the two housing projects and cannibalization of the Independence, Missouri property's renter base.

### Issues Regarding Community Support: <u>West Des Moines, Iowa Site</u>

77. The Viability Parameters require that support for the project be confirmed with local political and other stakeholders (*e.g.*, mayor, town council, and community members) to minimize the risk of delays and costs associated with community opposition.

78. Calamar does not undertake development projects that, upon due investigation, are likely to encounter public opposition. Calamar always requires confirmation of public support and acceptance of the project prior to site selection to ensure it will not encounter prohibitive costs due to public opposition.

79. Calamar's arrangement with Defendant did not involve Calamar conducting its own independent due diligence investigation with respect to local government and community support.

80. Defendant recommended the West Des Moines, Iowa site to Calamar. In response, Calamar issued a Notice to Proceed with respect to the West Des Moines, Iowa site.

81. In fact, Defendant never performed any investigation of potential opposition to development of the site by local government and community stakeholders.

82. The West Des Moines, Iowa project was abandoned by Calamar when local opposition and government resistance to the project became apparent.

83. Calamar paid Defendant $35,625.00 prior to encountering local opposition to the Wes Des Moines, Iowa project, which should have been investigated by Defendant prior to its recommendation of the site to Calamar. By reason of the foregoing Defendant was not entitled to such fees.

84. In meetings between Defendant and Calamar executives following the voicing of local opposition to the project, Defendant confessed it never performed any investigations with government officials or other local stakeholders.

### Issues Regarding Costs of Project: Johnson City, Kanas Site

85. The Viability Parameters require that a potential site be subject to development into a senior housing facility within an established budget of cost and expense.

86. Defendant knew or should have known from a visit to the Johnson City, Kansas site that the costs of remediating site conditions and the construction of extensive roadways would cause the project to fail to meet the established budget of cost and expense included in the Viability Parameters.

{4759105:2}

87. Notwithstanding the foregoing, Defendant recommended the Johnson City, Kansas site to Calamar as having met all Viability Parameters. In response, Calamar issued a Notice to Proceed with respect to the site.

88. Calamar subsequently learned of the unacceptable site conditions when it prepared a cost estimate for development of the site into a senior housing facility.

89. Calamar paid Defendant $49,600.00 in fees with respect to the Johnson City, Kansas site prior to the discovery of the projected cost overruns, which payments Defendant was not entitled to receive.

### FIRST CAUSE OF ACTION
**(Declaratory Judgment Pursuant to Fed. R. Civ. P. 56 & 28 U.S.C. § 2201)**

90. Calamar repeats and re-alleges the allegations previously set forth above.

91. Calamar and Defendant entered into a series of Consulting Services Agreements by which Calamar sought, *inter alia*, services from Defendant to assist Calamar in locating, identifying, evaluating and acquiring real property sites that met Calamar's Viability Parameters.

92. Defendant has made unjustified written demand for payment by Calamar under the Consulting Services Agreements for over $350,000.00.

93. Calamar denies that any payment is owing to Defendant under the Consulting Services Agreements due to, *inter alia*, Defendant's improper and/or failure of performance, failure to exercise care and diligence in the performance of the contracts and/or breach of the contracts by Defendant, and for the reasons set forth in the second cause of action.

94. As a result, a justiciable controversy exists as to the rights and other legal relations between Calamar and Defendant under the Consulting Services Agreements, namely whether Defendant is entitled to payment as demanded.

95. Declaratory judgment is warranted because it will have an immediate practical effect on the conduct of the parties in determining the rights and obligations of payment and terminate the controversy.

## SECOND CAUSE OF ACTION
(Declaratory Judgment Pursuant to Fed. R. Civ. P. 56 & 28 U.S.C. § 2201)

96. Calamar repeats and re-alleges the allegations previously set forth above.

97. Pursuant to the Consulting Services Agreements, Defendant located and/or negotiated terms of purchase of certain real estate sites on Calamar's behalf.

98. The Consulting Services Agreements compensated Defendant for performing certain services that require licensure as a real estate broker pursuant to state laws and regulations, including, *inter alia*, locating and/or negotiating terms of purchase of real estate sites. N.Y. Real Prop. Law § 442-d; § 339.160 R.S.Mo.; K.S.A. § 58-3038; Iowa Code § 543B.30.

99. Upon information and belief, Defendant is not a licensed real estate broker in the states of New York, Missouri, Kansas or Iowa.

100. The Consulting Services Agreements, the performance of the services thereunder by Defendant, and the terms of compensation of Defendant for rendering such services are void as a violation of the laws of the states of New York, Missouri, Kansas and Iowa.

101. As a result, a justiciable controversy exists as to the rights and other legal relations between Calamar and Defendant under the Consulting Services Agreements, namely whether Defendant was acting in the capacity of an unlicensed real estate broker pursuant to the terms of and/or in the performance of the Consulting Services Agreements.

102. Declaratory judgment should be granted declaring that no monies are due and owing to Defendant because Defendant, in performance of the Consulting Services Agreements,

was acting as an unlicensed real estate broker in violation of state laws and regulations. Declaratory judgment should be further granted requiring that Defendant disgorge all monies paid to it by Calamar for real estate services rendered without the required licensure.

103. Declaratory judgment is warranted because it will have an immediate practical effect on the conduct of the parties in determining the rights and obligations of payment and terminate the controversy.

### THIRD CAUSE OF ACTION
**(Breach of Contract)**

104. Calamar repeats and re-alleges the allegations previously set forth above.

105. By reason of the foregoing, Defendant breached the Consulting Services Agreements by, *inter alia*, failing to locate and identify sites that conformed to Calamar's Viability Parameters; negligently negotiating terms of purchase of certain sites on Calamar's behalf; improperly performing the services in the Consulting Services Agreements and/or failure to exercise care and diligence in the performance of the Site Selection Services.

106. As a direct and proximate result, Calamar has suffered damages in an amount to be proven at trial.

### DEMAND FOR JURY TRIAL PURSUANT TO FED. R. CIV. P. 38(b)

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Calamar demands a trial by jury of all issues triable in this case.

**WHEREFORE**, the Calamar Enterprises, Inc. respectfully requests that this Court enter judgment:

1. Granting Calamar a speedy hearing pursuant to Fed. R. Civ. P. 57 and declaring that Defendant has no entitlement to payment as demanded;

{4759105:2 }

2. Declaring that no payments are due and owing to Defendant by Calamar;

3. Declaring that the Consulting Services Agreements are void as illegal contracts pursuant to N.Y. Real Prop. Law § 442-d; § 339.160 R.S.Mo.; K.S.A. § 58-3038; and/or Iowa Code § 543B.30 and ordering Defendant to disgorge the payments received pursuant to such contracts;

4. Awarding damages to Calamar for Defendant's breach of the Consulting Services Agreements in an amount to be proven at trial; and

5. Granting such other and further relief as this Court deems just and proper.

Dated: Buffalo, New York
January 19, 2017

                **WOODS OVIATT GILMAN LLP**

By:    /s/ Robert C. Carbone
William F. Savino
Robert C. Carbone
*Attorneys for Plaintiffs,*
*Calamar Enterprises, Inc.*
1900 Main Place Tower, 350 Main Street
Buffalo, New York 14202
Telephone: (716) 248-3210
Facsimile: (716) 248-3313
rcarbone@woodsoviatt.com